**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ARLINGTON INDUSTRIES, INC.,** | : | **CIVIL ACTION NO. 3:06-CV-1105** |
| | : | |
| **Plaintiff,** | : | |
| | : | **(Judge Conner)** |
| **v.** | : | |
| | : | |
| **BRIDGEPORT FITTINGS, INC.,** | : | |
| | : | |
| **Defendant** | : | |

## MEMORANDUM

Presently before the court is a motion for a preliminary injunction (Doc. 369) filed by Arlington Industries, Inc. ("Arlington") on July 1, 2011. Arlington seeks to enjoin Bridgeport Fittings, Inc. ("Bridgeport") from making, using, selling, offering to sale or importing, or causing or inducing others to make, use, sell, offer to sell, or import Bridgeport's Whipper-Snap Duplex products ("the duplex connectors"), catalog numbers 3838ASP and 3838SP. Arlington claims that the duplex connectors infringe Arlington's patent number 5,266,050 ("the '050 patent"). The court conducted an evidentiary hearing on the motion on July 14, 2011. For the reasons that follow, the court will grant the motion.[1]

## I.  Background

Arlington and Bridgeport are fierce competitors in the electrical conduit fitting industry. This case concerns a particular type of electrical conduit fitting

---

[1] The following discussion shall constitute the court's findings of fact and conclusions of law for purposes of Rule 52(a)(2) of the Federal Rules of Civil Procedure.

with a snap-in feature.  Litigation between the parties over the patent underlying

this type of fitting has been ongoing since 2001.  See Arlington Indus., Inc. v.

Bridgeport Fittings, Inc., Civ. A. No. 3:01-CV-0485 (M.D. Pa.) (hereinafter "Arlington

I").  The Arlington I litigation instituted in 2001 originally concerned only

Bridgeport's single connector snap-in products.  The Bridgeport duplex connectors

that form the basis of Arlington's present motion for preliminary injunction were

first asserted as infringing products in the above-captioned case in 2006 ("Arlington

II").  (Doc. 3).  The Duplex Connectors became a part of the Arlington I litigation

during the discovery phase of that litigation, but after the same claim was asserted

in the instant litigation.  Unbeknownst to Honorable A. Richard Caputo, who was

initially assigned to the above-captioned case,[2]  and the undersigned, who presided

over the Arlington I litigation, the Duplex Connectors were subject to litigation in

two cases for identical allegations of infringement of Claim 8 of the '050 patent.

Neither party sought immediate consolidation, and this matter and Arlington I

proceeded on parallel tracks.  Suffice it to say, for purposes of the pending motion,

that the procedural path leading to Arlington's request for preliminary injunctive

relief has been rather complicated.

### A.   Arlington's '050 Patent

In 1992, Arlington developed and manufactured a new type of electrical

conduit fitting, intended to replace previous units whose installation required the

---

[2] Judge Caputo transferred the case to the undersigned on June 24, 2011. (Doc. 368).

use of two hands to screw the device into an electrical junction box.[3]  (See Doc. 102,

Ex. B).  This connector features a circular spring metal adaptor, to which at least

two outwardly sprung members are attached at the trailing end.  (See id. at col. 10).

When the adaptor is inserted into the knockout hole of an electrical junction box, its

outwardly sprung members lock the adaptor into place.  (See id.)  Thus, Arlington's

connector allows a user to quickly connect the device to a junction box using one

hand instead of two, thereby reducing the time and effort required during

installation.  (See id. at col. 1).

On December 15, 1992, Arlington was awarded United States Patent Number

5,171,164 ("the '164 patent") which covered the design of the above-described

device.  (Arlington I, Doc. 404 ¶ 2; Doc. 432 ¶ 2).  Arlington acquired the '050 patent

the following year.  (Doc. 102, Ex. B).  The '050 patent is a "continuation patent,"

meaning that it shares a common specification with the '164 patent, but includes

different claims.  (Arlington I, Doc. 404 ¶ 2; Doc. 432 ¶ 2.)  The '050 patent

encompasses eight claims, only one of which is the focus of the instant litigation.

The claim at issue—Claim 8—reads as follows:

> A quick connect fitting for an electrical junction box comprising:
>
> a hollow electrical connector through which an electrical conductor
>     may be inserted having a leading end thereof for insertion in a
>     hole in an electrical junction box;
>
> a circular spring metal adaptor surrounding said leading end of said

---

[3] An electrical junction box is used to run multiple conductors in two or more
directions, allowing power to flow simultaneously to various electrical devices.

electrical connector which has a leading end, a trailing end, and an intermediate body;

at least two outwardly sprung members carried by said metal adaptor near said trailing end of said adaptor which engage the side walls of the hole in the junction box into which said adaptor is inserted;

at least two spring locking members carried by said metal adaptor that spring inward to a retracted position to permit said adaptor and locking members to be inserted in a hole in an electrical junction box and spring outward to lock said electrical connector from being withdrawn through the hole; and

an arrangement on said connector for limiting the distance said connector can be inserted into the hole in the junction box.

In 1999, Bridgeport introduced its own product line of quick-connect fittings called the "Snap-In Fitting." (See Arlington I, Doc. 170 at 7-10). The "Snap-In Fittings" were designed with characteristics nearly identical to those featured in Arlington's patented products. (See Arlington I, Doc. 310 ¶ 2.5). Arlington filed the Arlington I litigation in March 2001, alleging that the "Snap-In Fittings" infringed both the '164 and the '050 patents. (See Arlington I, Doc. 1).

### B.   The Whipper-Snap Duplex Connectors and Subsequent Litigation

In September 2005, Bridgeport designed a new quick-connect electrical fitting, which it called the "Whipper-Snap." (Arlington I, Doc. 404 ¶ 14; Doc. 432 ¶ 14). The Whipper-Snap is similar to the '050 patent, in that it features a circular spring metal adaptor that is affixed atop a hollow connector body. (See Arlington I, Doc. 383 ¶ 9(a); Doc. 438 at 1; Doc. 439 ¶ 9(a)). Attached to the leading end of the adaptor are a total of four tensioning tangs and two anchoring tabs. (See Arlington I, Doc. 307, at 5). The tensioning tangs' purpose is twofold: (1) to lock the adaptor

4

securely in position when the fitting is inserted into a knockout hole, and (2) to thereafter "maintain good electrical continuity, or ground, between the electrical connector, the junction box and the electrical source leading to the box." (See Arlington I, Doc. 384, Ex. K ¶¶ 17, 20; Doc. 394, Ex. A ¶¶ 36, 44; Doc. 401 at 16-18; Doc. 425, Ex. M at 85-88; Doc. 439 ¶ 11(d)).  The purpose of the anchoring tabs is to fasten the spring metal adaptor durably to the hollow connector body.  (See Arlington I, Doc. 394, Ex. A ¶ 38).

On May 31, 2006, Arlington filed the instant litigation alleging that Bridgeport's duplex connectors—two products in the Whipper-Snap product line—infringed a separate Arlington patent, number 6,521,831.  (Doc. 1).  By amended complaint dated June 27, 2006, Arlington asserted a second claim against the duplex connectors, alleging that the duplex connectors infringed Claim 8 of the '050 patent.  (Doc. 3).[4]  The above-captioned matter (hereinafter "Arlington II") was initially assigned to the Honorable A. Richard Caputo.  Shortly after commencing this litigation, Arlington also amended its complaint in Arlington I adding the duplex connectors as products infringing the '050 patent.

On December 4, 2007, Judge Caputo issued his Markman claim construction ruling on the '050 patent.  (Doc. 98).  Nearly three months later, on February 25, 2008, the Arlington I court issued its Markman ruling in which it construed certain

---

[4]  The United States Patent & Trademark Office is currently conducting a reexamination of the '831 patent.  The parties have agreed to a stay of the '831 patent claims against the duplex connectors pending completion of the reexamination as well as any appeal to the Federal Circuit.  (Doc. 367, at 4).

terms of Claim 8 of the '050 patent in a manner materially different from the construction issued by Judge Caputo. (Arlington I, Doc. 376). The parties filed motions for summary judgment in each case. (Docs. 382, 385; Arlington II, Docs. 110, 112, 113). On September 18, 2008, Judge Caputo granted Bridgeport's motions for summary judgment in the above-captioned case, concluding that Arlington could not prove infringement of the '050 patent by Bridgeport's duplex connectors. (Doc. 307). However, on February 4, 2009, the Arlington I court denied the parties' cross-motions for summary judgment on the issue of infringement and set trial for September 2009. (See Arlington I, Docs. 471, 474).

Days before trial in Arlington I, Bridgeport filed a motion to stay the trial in Arlington I on collateral estoppel grounds as a result of Judge Caputo's judgment of non-infringement of the duplex connectors in the above-captioned case. (Arlington I, Doc. 561). The undersigned denied the motion, but excised the duplex connectors from trial. (Arlington I, Doc. 584). A jury returned a verdict in favor of Arlington, finding that thirty of Bridgeport's single connector products infringed the '050 patent. The parties appealed both cases to the United States Court of Appeals for the Federal Circuit.

On January 20, 2011, the Federal Circuit issued its opinion with respect to the above-captioned matter. See Arlington Indus., Inc. v. Bridgeport Fittings, Inc., 632 F.3d 1246 (Fed. Cir. 2011). The Federal Circuit vacated the grant of summary judgment of non-infringement of the '050 patent by the duplex connectors due to an erroneous claim construction of the '050 patent. (Id.) The mandate issued on April

21, 2011. (Doc. 365). Judge Caputo subsequently re-opened the above captioned

matter on June 24, 2011 and re-assigned the case to the undersigned for all further

proceedings. (Doc. 368). The appeal of the <u>Arlington I</u> matter is presently pending

before the Federal Circuit.

### C.   <u>Motion for Preliminary Injunction and Evidentiary Hearing</u>

On July 1, 2011, Arlington filed the present motion for a preliminary

injunction. (Doc. 369). The motion is unique in the context of the <u>Arlington I</u> and

<u>Arlington II</u> litigation. The request for preliminary injunctive relief comes over five

years after the initiation of the litigation against Bridgeport's duplex connectors.

Unlike the typical motion for preliminary injunctive relief in a patent case, the court

has already conducted a <u>Markman</u> hearing and construed the terms of the disputed

claim of the patent at issue. Additionally, with one exception, the parties agree that

the accused duplex connector products meet each of the limitations identified in

Claim 8 of the '050 patent. (<u>See</u> <u>Arlington I</u>, Doc. 438 at 1; Doc. 453 at 1). The sole

disputed limitation concerns whether Bridgeport's duplex connectors contain

"outwardly sprung members." In the <u>Arlington I</u> litigation, the undersigned

construed "outwardly sprung members" to mean "members bent outward at an

angle relative to the normal plane of the adaptor." (<u>Arlington I</u>, Doc. 376). In the

instant litigation, Judge Caputo construed "outwardly sprung members" to mean

"resilient members which are toward the outside of the adaptor." (Doc. 98, at 33).

The parties thoroughly briefed the matter and submitted declarations and

exhibits in support of their respective positions. On July 14, 2011, the court

conducted an evidentiary hearing on the motion[5] during which Arlington proffered the expert testimony of Dr. Christopher D. Rahn ("Dr. Rahn"), and Thomas Gretz, one of the named inventors of the '050 patent and Vice President of Arlington.  On the basis of the record evidence and the testimony put forth at the preliminary injunction hearing, the court makes the following findings of fact.

Arlington and Bridgeport are the only competitors in the market for electrical conduit fittings with respect to the quick-connect or snap-in feature at issue in this litigation.  (Hr'g Tr. at 77, 89-91, 93-99; Doc. 386 ¶¶ 9-17).  Other similar products on the market identified by Bridgeport do not practice the features practiced by the Arlington and Bridgeport duplex connectors.  (Hr'g Tr. at 77, 89-91, 93-99; Doc. 386 ¶¶ 9-17).  Since 1999, when the duplex connectors were introduced into the market, Arlington has sold approximately 40 million units, comprising eight percent of Arlington's total sales.  (Hr'g Tr. at 79; Doc. 386 ¶ 5).  Arlington does not license its high volume products and it vigorously enforces its patent right to exclude competitors from practicing the '050 patent.  (Doc. 371 ¶ 8).

In determining whether Bridgeport's duplex connectors infringe Claim 8 of the '050 patent, the relevant state of the connector for the infringement analysis is a connector that is fully assembled—a connector with the tensioning tang ring attached to the connector body.  (Hr'g Tr. at 68; see also Doc. 387 ¶ 22).  The applicable claim construction of "outwardly sprung members" is the one issued by

---

[5] References to the June 14, 2011 hearing transcript are denoted throughout as "Hr'g Tr. at __."

the undersigned in the <u>Arlington I</u> matter.  (<u>See</u> <u>Arlington I</u>, Doc. 376).  Therefore, outwardly sprung members are "members bent outward at an angle relative to the normal plane of the adaptor."  (<u>Id.</u>)

Arlington's expert, Dr. Rahn presents credible evidence that fully-assembled Bridgeport duplex connectors infringe the '050 patent.  The methodology employed by Dr. Rahn is identical to that used by Dr. Rahn for his expert opinion in the September 2009 <u>Arlington I</u> trial and which the court expressly found to be admissible.  (<u>Arlington I</u>, Doc. 582).  Dr. Rahn did not conduct any measurements of the duplex connectors prior to assembly or subsequent to disassembly.  (Hr'g Tr. at 68).  Measurements conducted on 89 fully-assembled Bridgeport duplex connectors establish that the tension tangs meet the "outwardly sprung members" limitation of Claim 8 of the '050 patent.  (Hr'g Tr. at 20-32; <u>see</u> <u>also</u> Doc. 387 ¶¶ 10-12).  Dr. Rahn's measurements and calculations demonstrate that the tension tangs of the Bridgeport duplex connectors are bent outward at an average angle of 3.17 degrees relative to the normal plane of the adaptor.  (Hr'g Tr. at 20-32; <u>see</u> <u>also</u> Doc. 387 ¶¶ 10-12).  In contrast, Bridgeport's expert, John Brian Peter Williamson, presents measurements indicating that Bridgeport's duplex connectors do not practice the "outwardly sprung members" limitation of Claim 8 of the '050 patent.  (<u>See</u> Doc. 381 ¶¶ 9, 11-17, 22-25).  Williamson's measurements and ultimate conclusion are based on a faulty premise: that "in order to know whether the 'sprung' limitation is met while the adaptor is assembled on the body, it is necessary to determine whether

the tangs do or do not recover their original shape when the force causing the bending has been removed." (Id. ¶ 9).

As a result of the two-competitor market, each infringing sale by Bridgeport of its duplex connectors is likely a lost sale for Arlington. (Hr'g Tr. at 80-81). Monetary compensation would be insufficient to cure the harm caused by Bridgeport's purported infringement. Bridgeport sells the duplex connector at fifteen to twenty percent less than Arlington, and Arlington cannot sell at a lower price due to the costs it incurred in developing the design, purchasing equipment and marketing the product. (Id. at 103-104). Without an injunction, Arlington will face significant difficulty in its attempts to recapturing lost customers, especially because the '050 patent will expire December 4, 2011. (Id. at 82-85; see also Doc. 386 ¶ 20). Arlington's reputation in the market is being harmed: distributors are confused by the presence of essentially the same product in the market place offered by both Arlington and Bridgeport and sold under nearly identical product numbers. (Hr'g Tr. at 85-86).

## II.    **Legal Standard**

Section 283 of the Patent Act expressly provides that district courts "may grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent." 35 U.S.C. § 283. Whether to grant or deny a preliminary injunction rests within the sound discretion of the district court. Polymer Technologies, Inc. v. Bridwell, 103 F.3d 970, 973 (Fed. Cir. 1996) (citing Novo Nordisk of North Am., Inc. v. Genentech, Inc., 77 F.3d 1364, 1367 (Fed. Cir.

1996)).  A patent infringement claimant requesting a preliminary injunction must satisfy a four-factor test before acquiring such relief.[6]  Arlington must show: (1) a reasonable likelihood of success on the merits; (2) irreparable harm in the absence of relief; (3) the balance of hardships weighs in its favor; and (4) an injunction is in the public interest.  AstraZeneca LP v. Apotex, Inc., 633 F.3d 1042, 1049 (Fed. Cir. 2010); Amazon.com Inc. v Barnesandnoble.com, Inc., 239 F.3d 1343, 1350 (Fed. Cir. 2001).  Individually, no one factor is dispositive.  Amazon.com, Inc., 239 F.3d at 1350 (citing Hybritech, Inc. v. Abbot Labs., 849 F.2d 1446, 1451 (Fed. Cir. 1988)).  However, a preliminary injunction shall not issue unless the movant establishes a likelihood of success on the merits and irreparable harm absent an injunction. Atlana Pharma AG v. Teva Pharms. USA, Inc., 566 F.3d 999, 1005 (Fed. Cir. 2009). The court must weigh each factor against the others and the requested relief, id., keeping in mind that "[a] preliminary injunction is a drastic and extraordinary remedy."  Nat'l Steel Car, Ltd. v. Canadian Pac. Ry., Ltd., 357 F.3d 1319, 1324 (Fed. Cir. 2004) (citation and quotations omitted).

## III.  Discussion

### A.  Likelihood of Success on the Merits

To establish a likelihood of success on the merits, Arlington "must demonstrate that it will likely prove infringement of one or more claims of the

---

[6] The standard governing the issuance of an injunction pursuant to 35 U.S.C. § 283 is governed by the law of the Federal Circuit.  See Hybritech Inc. v. Abbott Labs., 849 F.2d 1446, 1451 n.12 (Fed. Cir. 1988).

patents-in-suit, and that at least one of those same allegedly infringed claims will also likely withstand the validity challenges presented by the accused infringer." AstraZeneca LP, 633 F.3d at 1050 (quoting Amazon.com, Inc., 239 F.3d at 1351). The latter inquire is not at issue.  Bridgeport has stipulated to the validity of the '050 patent. (See Doc. 270).  Therefore, Arlington need only demonstrate that it will likely prove infringement of the '050 patent by Bridgeport's duplex connectors.

Patent infringement is proved through a two-step process.  First, the court construes the claims of the patent.  Markman v. Westview Instruments, Inc., 52 F.3d 967, 970-71 (Fed. Cir. 1995) (en banc).  Second, the court compares the construed claims to the allegedly infringing product.  See Oakley, Inc. v. Sunglass Hut Int'l, 316 F.3d 1331, 1339 (Fed. Cir. 2003).

The Arlington I and Arlington II courts have both previously construed Claim 8 of the '050 patent, and the parties dispute which court's claim construction applies to the instant matter.  Bridgeport asserts that the claim construction issued by Judge Caputo in the above-captioned matter is appropriate. (Doc. 378, at 16). Arlington contends that the claim construction issued by the undersigned in the Arlington I matter—in which there is a final judgment—prevails on collateral estoppel grounds. (Doc. 370, at 13).

There is a final judgment in Arlington I.  This court has previously noted that "[w]hen a court provides a Markman interpretation of a claim's language, and that interpretation was essential to a final resolution of a dispute over infringement, a party to the suit is precluded from seeking a different interpretation of the same

language in a subsequent dispute." (<u>Arlington I</u>, Doc. 773, at 14-15 (citing <u>Molinaro</u> <u>v. Fannon/Courier Corp.</u>, 745 F.2d 651, 655 (Fed. Cir. 1984))).  With the judgment vacated in the above-captioned matter, the court declines to proceed with different <u>Markman</u> constructions of the same claim of the '050 patent in the <u>Arlington I</u> and <u>Arlington II</u> matters.  The <u>Arlington I</u> claim construction has preclusive effect and will apply throughout the remainder of the proceedings in this matter.[7]

Moving to the second step of a patent infringement claim, Arlington must establish a likelihood of success in proving each claim limitation of the '050 patent is present in the duplex connectors.  Arlington need not prove infringement with absolute certainty in order to obtain a preliminary injunction, but need only establish a likelihood of success on the merits at trial.  <u>See</u> <u>Abbott Labs v. Sandoz,</u> <u>Inc.</u>, 544 F.3d 1341, 1364 (Fed. Cir. 2008).  The court should refrain from issuing a preliminary injunction "if an alleged infringer raises a substantial question" regarding infringement.  <u>AstraZeneca LP</u>, 633 F.3d at 1050.

Under the <u>Arlington I</u> claim construction, Bridgeport does not dispute that its duplex connectors practice four of the five limitations of Claim 8 of the '050

---

[7] Moreover, the court notes that the <u>Arlington I</u> claim construction adopted Bridgeport's proposed construction of the term "outwardly sprung members."  (<u>See</u> <u>Arlington I</u>, Doc. 376, at 16-18).  Therefore, by applying the <u>Arlington I</u> claim construction, the court is utilizing the very construction for the term that Bridgeport originally suggested, and it is curious that Bridgeport now opposes the use of its own claim construction.

patent.[8]  (Arlington I, Doc. 522, at 5-6).  Only the "outwardly sprung members"

limitation of Claim 8 is in dispute.  The court construed "outwardly sprung

members" to mean "members bent outward at an angle relative to the normal plane

of the adaptor."  (Arlington I, Doc. 376).[9]  Through declaration and argument

presented at the July 14, 2011 evidentiary hearing Arlington put forth evidence that

the duplex connectors meet the outwardly sprung members limitation.  (See Docs.

373, 387; Hr'g Tr. at 5-75).  Arlington's expert, Dr. Rahn, testified that 100 percent of

the duplex connectors he tested met the outwardly sprung members limitation as

construed by the undersigned in Arlington I.  (Hr'g Tr. at 27; see also Doc. 387 ¶ 12).

Dr. Rahn testified that the Whipper-Snap duplex connectors bent outward at an

average angle of 3.17 degrees, larger than the angle of the single connectors found

to be infringing in Arlington I.  (Hr'g Tr. at 28; Doc. 387 ¶ 13).

Bridgeport criticizes Dr. Rahn's methodology in several ways.  First,

Bridgeport contends that the "normal plane of the adaptor" is established during

manufacturing and Dr. Rahn considered only fully-assembled connectors.  (Doc.

---

[8]  Bridgeport did not contest the presence of the four limitations in any of its Whipper-Snap electrical connector products, which at the time included both the singled and the duplex connectors.  (Arlington I, Doc. 522, at 5-6).  The undersigned excised the duplex connectors from the trial after being apprised of the final judgment of non-infringement of the '050 patent by the duplex connectors issued in the above-captioned matter.  (Arlington I, Doc. 584, at 10).  The Federal Circuit vacated that final judgment in an opinion dated January 20, 2011.  Arlington Indus., Inc., 632 F.3d 1246.

[9]  This claim construction applies to a fully-assembled connector with the adaptor placed on the connector body.  (See Hr'g Tr. at 46; see also Arlington I, Doc. 582, at 12 n.8).

378, at 17).  Bridgeport calls Dr. Rahn's measurements "unreliable," and claims that

Dr. Rahn's angle measurements are the result of "a flawed mathematical formula"

that applies two-dimensional mathematics to a three-dimensional product.  (Id. at

19-20; Hr'g Tr. at 55-58).  Bridgeport asserts that Dr. Rahn failed to show any

permanent outward movement of the tensioning tangs of the connector due to his

failure to measure the position of the tangs prior to mounting on the connector

body and subsequent to disassembly from the connector body.  (Id. at 37-48; see also

Doc. 381 ¶ 9).  Finally, Bridgeport challenges Dr. Rahn's sampling methods,

whether they conform with accepted statistical sampling methods and whether the

sample is a representative, statistically significant sample of the universe of

Bridgeport's duplex connectors.  (Hr'g Tr. at 48-62).

    After consideration of the parties' arguments, the declaration and testimonial

evidence of Dr. Rahn (Docs. 373, 388; Hr'g Tr. at 5-75), and the declaration of

Bridgeport's expert, John Brian Peter Williamson (Doc. 381), the court finds that

Arlington has satisfied its burden and established a likelihood of success on the

merits in proving infringement.  Dr. Rahn, utilized the same testing method in the

instant matter that he employed in the Arlington I matter, and, in fact, tested

duplex connectors for presentation to the jury in Arlington I before they were

excised therefrom.  Moreover, in the Arlington I matter, the undersigned held Dr.

Rahn's opinion, based on his testing methodology, admissible.  (Arlington I, Doc.

582, at 4-17; id. at 7 ("Rahn's measurements, and the conclusions derived therefrom,

are admissible under the standard set forth in Daubert."); id. at 9-10 ("Bridgeport

offers no evidence or case law to suggest that Rahn's sample size is scientifically unreliable, or that admission of his opinions requires him to first perform a statistical analysis.")).  Although Bridgeport raised questions about how Dr. Rahn obtained the sample of duplex connectors tested by him (Hr'g Tr. at 48-62), Arlington submitted invoices for the sample connectors during the evidentiary hearing.  (Plaintiff's Hr'g Exs. 3-7).  Beyond noting that nearly all the duplex connectors were obtained from the same distributor (Hr'g Tr. at 124-25), Bridgeport presented no evidence which would demonstrate that the distributor was not an authorized distributor of Bridgeport's duplex connectors, or that the duplex connectors may have been altered in such a way as to render them unrepresentative or non-conforming.[10]

Bridgeport continues to misapprehend the relevant condition of the connector from which liability will be determined.  The "outwardly sprung members" claim construction must be construed with a fully-assembled connector, not prior to assembly and after disassembly.  Given the court's <u>Markman</u> construction, and the parties' agreement that the claim refers to a fully assembled connector, Bridgeport has simply not raised a substantial question regarding

---

[10] Dr. Rahn did not calculate the margin of error on the sample of duplex connectors he tested, nor did he make a determination of whether the sample size was statistically significant.  However, the court finds that his sample size of 89 duplex connectors is quite sufficient and that conformance to standard statistical formulae is unnecessary for one simple reason, to wit: without outwardly sprung members, the product loses its functionality and becomes defective.

infringement.  Arlington is likely to succeed on the merits.  This factor weighs heavily in favor of granting a preliminary injunction.

### B.    Irreparable Injury

Arlington must also establish that it will suffer irreparable injury in the absence of the requested injunctive relief.  The court will not simply presume irreparable injury flows from a finding, or the likelihood of finding, patent infringement.  See eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388 (2006); see also Precision Med., Inc. v. Genstar Techs. Co., Civil Action No. 10-5161, 2011 WL 1674354, at *10-13 (E.D. Pa. May 3, 2011) (engaging in detailed discussion of whether a presumption of irreparable injury exists in the context of a preliminary injunction and concluding in the negative).  To establish irreparable injury Arlington must show that its injury cannot adequately compensated through a monetary award. Automated Merchandising Sys., Inc. v. Crane Co., 357 Fed. App'x 297, 301 (Fed. Cir. 2009).  By definition, lost sales alone are insufficient to establish irreparable injury because lost sales are compensable through monetary damages.  See Abbott Labs v. Andrx Pharms., Inc., 452 F.3d 1331, 1348 (Fed. Cir. 2006).  At a minimum, lost market share must be proven and must be proven through more than mere speculation.  See Automated Merchandising Sys., Inc., 357 Fed. App'x at 301.

Arlington asserts that it will suffer irreparable harm because, as direct competitors, Bridgeport's sale of the duplex connectors captures customers that would otherwise purchase the product from Arlington.  (Doc. 370, at 16).  Arlington asserts that without a preliminary injunction it will suffer a loss of market share,

17

revenue, brand recognition, and customer goodwill, as well as its patent right to exclude others from practicing its designs.  (Id.; Doc. 371 ¶¶ 7, 10, 12).  Arlington contends that there is confusion in the marketplace caused, at least in part, by Bridgeport's catalog numbering of the duplex connectors (3838ASP and 3838SP) which closely resembles Arlington's catalog numbers (3838AST and 3838ST) for its duplex connector.  (Doc. 370, at 126; doc. 371 ¶ 7).

Bridgeport counters that Arlington will not be irreparably harmed without a preliminary injunction, as clearly established by Arlington's behavior over the five-year history of the present litigation.  (Doc. 378, at 23).  Bridgeport notes that the motion for a preliminary injunction comes over five years after the instigation of this litigation by Arlington, and Arlington previously requested a stay of the entire litigation.  (Id. at 23-24; Doc. 257, at 14).  Moreover, Bridgeport asserts that the marketplace for snap-in duplex connector electrical conduit fittings has changed in the past sixteen months and that there are numerous other competitors to Arlington besides just Bridgeport.  (Doc. 378, at 9-11, 24-25; Doc. 382 ¶¶ 5-9).

Initially, the court notes that delay by the movant in seeking a remedy is a relevant and important factor in the preliminary injunction analysis.  See High Tech Med. Instrumentation, Inc. v. New Image Inds., Inc., 49 F.3d 1551, 1557 (Fed. Cir. 1995).  In the instant matter, however, the court does not weight the delay as heavily as it might otherwise.  The procedural progression of this case and the parallel litigation in Arlington I is undeniably unique.  Through oversight or inadvertence, neither party found it necessary to seek immediate consolidation of

Arlington I and Arlington II, despite the overlapping claims.  Trial proceeded in

Arlington I, but the court excised duplex connectors from the list of alleged

infringing products to circumvent the troublesome issue of collateral estoppel.

(Arlington I, Doc. 584, at 10).  In light of the unusual procedural history of the

parallel litigation, Arlington explains:

> The preliminary injunction that Arlington presently seeks is in
> reality an attempt to obtain the injunctive relief that it would have
> received but for the erroneous claim construction of "spring metal
> adaptor" that has since been vacated.  But for that erroneous
> construction, the Duplex Connectors would not have been excised
> from the Arlington I trial and would have been enjoined as of
> September 2009. . . .
>      As a result of that erroneous ruling, a permanent injunction was
> procedurally unavailable to Arlington which is why it filed the present
> motion for a preliminary injunction.  Namely, until only a couple of
> weeks ago, Arlington had no avenue to bring the present motion as the
> erroneous claim construction ruling had stripped this Court of
> jurisdiction over these proceedings for an extended period of time . . .

(Doc. 384, at 18-19).  On June 24, 2011, the court re-opened the above-captioned

matter (Doc. 368), and Arlington filed the instant motion for a preliminary

injunction on July 1, 2011.  (Doc. 369).  The court concludes that the delay does not

reflect a lack of irreparable harm given the unique and complicated procedural

progression of the Arlington I and Arlington II matters.

Of course, delay is but one factor relevant to the irreparable injury analysis.

Courts examine numerous factors to ascertain the extent of the injury, including the

patentee's licensing behavior; evidence of past harm to the patentee's market share,

revenues, and brand recognition; and the existence of a two-supplier market

consisting of the patentee and defendant.  See i4i Ltd. P'ship. v. Microsoft Corp.,

598 F.3d 831, 861-62 (Fed. Cir. 2010), aff'd 131 S. Ct. 2238 (2011) (explaining that "[p]ast harm to a patentee's market share, revenues, and brand recognition is relevant for determining" irreparable injury); Acumed LLC v. Stryker Corp., 551 F.3d 1323, 1328-29 (Fed. Cir. 2008) (considering whether patentee granted "previous licenses, the identity of past licensees, the experience in the market since the licenses were granted, and the identity of the new infringer"); Mass Engineered Design, Inc. v. Ergotron, Inc., 633 F. Supp. 2d 361, 393 (E.D. Tex. 2009) (holding that the "fact that there is direct competition [with the infringer] in the marketplace weighs heavily in favor of a finding of irreparable injury"); TruePosition Inc. v. Andrew Corp., 568 F. Supp. 2d 500, 531 (D. Del. 2008) ("Courts awarding permanent injunctions typically do so under circumstances where plaintiff practices its invention and is a direct market competitor.").

Arlington and Bridgeport are fierce direct competitors in the electrical conduit market.  Prior to Bridgeport's entry into the market for snap-in electrical conduit fittings, Arlington possessed one hundred percent of the market for snap-in fittings.  Each sale of a Bridgeport duplex connector likely deprives Arlington of market share, revenue, and brand recognition.  See TruePosition Inc., 568 F. Supp. 2d at 531-32 (finding irreparable harm when defendant's infringement caused patentee to lose business, goodwill, and harmed its reputation).  Bridgeport's assertion that the market for duplex connectors has changed in the last sixteen months with the entry of other competitors into the market does not alter the nature of the injury suffered by Arlington.  Although the parties may not be the only

competitors,[11] they are direct competitors, a factor of substantial weight in the

irreparable injury analysis.  See Mass Engineered Design, Inc., 633 F. Supp. 2d 393

(direct competitors); TruePosition Inc.,  568 F. Supp. 2d 531 (direct competitors).

Moreover, Arlington strategically declines to license the patent on its quick-connect

device and, instead, exploits its monopoly to exclude potential rivals.  See Acumed,

551 F.3d at 1328-29 (weighing licensing behavior as one factor in irreparable harm

analysis).  Collectively these factors establish that Arlington will be harmed in a

manner for which financial recompense is inadequate.  The first two factors favor

preliminary injunctive relief.

### C.    Balance of Hardships

The balance of hardships inquiry "assesses the relative effect of granting or

denying an injunction on the parties."  i4i Ltd. P'ship, 598 F.3d at 862.  A court may

consider "the parties' sizes, products, and revenue sources," id., but it should not

scrutinize the effect of equitable relief upon an infringer's customers, or examine

the infringer's costs and expenses in designing its infringing products, see Acumed,

551 F.3d at 1330.  In short, "one who elects to build a business on a product found to

---

[11]  Arlington's Vice President Thomas Gretz testified that the other
competitors are not true competitors in the market for snap-in duplex connectors.
(Hr'g Tr. at 77, 89-91, 93-99; Doc. 386 ¶¶ 9-17).  He asserted that the features of
Arlington's duplex connectors not practiced/available in other duplex connector
offerings. (Hr'g Tr. at 77, 89-91, 93-99; Doc. 386 ¶¶ 9-17).  Similarly, Bridgeport's
President and Chief Operating Officer, Paul Suzio, testified at a 2007 deposition in
the Arlington I matter that there were other competitors offering snap-in type
products but that they presented features and functions materially different from
the Whipper-Snap line of products.  (Doc. 388, Ex. E).

infringe cannot be heard to complain if an injunction against continuing

infringement destroys the business so elected." <u>Broadcom Corp. v. Qualcomm, Inc.</u>,

543 F.3d 683, 704 (Fed. Cir. 2008).

Arlington contends that the balance tips in its favor.  Without a preliminary

junction and given the impending expiration date of the '050 patent (December

2011), Arlington asserts that it will be denied the most fundamental right of its

patent: to exclude others.  (Doc. 370, at 20).  Arlington argues that Bridgeport will

suffer little, any injury would be self-inflicted and notes that Bridgeport's two

duplex connectors at issue in this litigation comprise less than .01 percent of

Bridgeport's product catalog of 2,000 products.  (<u>Id.</u>)  Bridgeport counters that a

preliminary injunction would destroy many long-term relationships with its

customers who have been purchasing duplex connectors from Bridgeport for over

five years.  (Doc. 378, at 26).  Bridgeport asserts that it will suffer significant harm to

its business, reputation and goodwill.  (<u>Id.</u>)

The court finds that the balance of hardships tips in Arlington's favor.

<u>See</u> <u>i4i Ltd. Partnership</u>, 598 F.3d at 863 (finding balance of hardships in patentee's

favor when infringing product "relates to only a small fraction of [defendant's]

sizable business").  The two Bridgeport duplex connectors are undeniably a very

minor contributor to Bridgeport's bottom line.  (Hr'g Tr. at 119 (asserting that an

injunction will result in lost profits of approximately $71,000 to Bridgeport); <u>see</u> <u>also</u>

<u>Arlington I</u>, Doc. 776, at 9; <u>Arlington I</u>, Doc. 660, at 235-237)  Arlington represented

that its duplex connectors represent eight percent of its business, a respectable

chunk of its sales.  (Doc. 386 ¶ 5).  Arlington practices its patent and refuses to

license it to others, instead exercising its right to exclude.  Arlington has attempted

to enforce its '050 patent through litigation against Bridgeport since 2001.  With

respect to the duplex connectors, Arlington began its litigation against Bridgeport

almost as soon as Bridgeport introduced its duplex connectors into the market.  The

passage of over five years' time without a ultimate resolution on the alleged

infringing duplex connectors does not entitle Bridgeport to the continued sale of

likely infringing products.  Given the small percentage of Bridgeport's profit margin

that the duplex connectors represent, the sizable portion of Arlington's business

stemming from Arlington's duplex connectors, and Arlington's diligent attempt to

enforce its patent rights, the balance of hardships favor's Arlington.

### D.   **Public Interest**

Finally, the court must consider whether the public interest is served by

granting a preliminary injunction in the instant matter.  "[T]he touchstone of the

public interest factor is whether an injunction, both in scope and effect, strikes a

workable balance between protecting the patentee's rights and protecting the

public from the injunction's adverse effects."  <u>i4i Ltd. P'ship</u>, 598 F.3d at 863 (citing

<u>Broadcom Corp.</u>, 543 F.3d at 704).  This factor typically "favors the patentee, given

the public's interest in maintaining the integrity of the patent system."

<u>MercExchange, L.L.C. v. eBay, Inc.</u>, 500 F. Supp. 2d 556, 586 (E.D. Va. 2007)

(citation and quotation omitted).  "Where products do not relate to a significant

compelling public interest, such as health or safety, this factor weighs heavily in favor of an injunction." <u>Mass Engineered Design, Inc.</u>, 633 F. Supp. 2d at 394.

Arlington asserts that the public interest favors a preliminary injunction to enforce its patent rights. (Doc. 370, at 21). Arlington argues that the public will not be harmed by the removal of Bridgeport's duplex connectors from the market due to the public's ability to obtain virtually the same product from Arlington, the patent holder. (<u>Id.</u> at 21-22). Bridgeport contends that the public has an interest in competitive markets for products, and that "[t]hat interest weighs in favor of allowing Bridgeport to practice its own valid patents." (Doc. 378, at 27).

The court finds that the public interest is best served by imposition of a preliminary injunction. Snap-in duplex connector electrical conduit fittings do not relate to public health or safety concerns, and the public will not be deprived of these products. Arlington can fulfill the demand for duplex connectors. Additionally, Bridgeport's interest in practicing its own valid patents is irrelevant to the instant litigation, which concerns itself with whether Bridgeport's Whipper-Snap duplex connectors infringe Arlington's admittedly valid '050 patent. The public interest favors the enforcement of Arlington's patent rights.

The court concludes that all four factors weigh in favor of the imposition of a preliminary injunction. The court will therefore preliminarily enjoin Bridgeport from directly or indirectly making, using, selling, offering for sale, or importing, or causing or inducing others to make, use, sell, offer to sell, or import, the Whipper-Snap duplex connectors, catalog numbers 3838ASP and 3838SP, or any colorable

imitations of these products.  The preliminary injunction will be effective upon the

posting of the security bond and expires on December 4, 2011, or upon order of the

court vacating the injunction, whichever occurs first.

E.    **Security Bond**[12]

Federal Rule of Civil Procedure 65(c) states that "[n]o restraining order or

preliminary injunction shall issue except upon the giving of security by the

applicant, for the payment of such costs and damages as may be incurred or

suffered by any party who is found to have been wrongfully enjoined or restrained."

FED. R. CIV. P. 65(c).  Although the amount of the bond is left to the court's

discretion, see Zambelli Fireworks Mfg.Co., Inc. v. Wood, 592 F.3d 412, 426 (3d Cir.

2010); Frank's GMC Truck Ctr., Inc. v. General Motors Corp., 847 F.2d 100, 103 (3d

Cir. 1988), Rule 65(c) requires the movant to post some security in order to "'deter[]

rash applications for interlocutory orders [by] causing plaintiff to think carefully

beforehand.'" Hoxworth v. Blinder, Robinson & Co., Inc., 903 F.2d 186, 211 (3d Cir.

1990) (alteration in original) (quoting Instant Air Freight Co. v. C.F. Air Freight,

Inc., 882 F.2d 797, 804 (3d Cir. 1989)).

Bridgeport originally requested that the court require a bond of

$188,000—the alleged amount of lost sales that an injunction will cause. (Doc. 378, at

---

[12]  The posting of a security bond pursuant to Federal Rule of Civil Procedure
65(c) is a procedural matter not unique to patent law.  See Int'l Game Tech. v. WMS
Gaming, Inc., No. 98-1361, 1999 WL 717801, at *1 n.1 (Fed. Cir. Sept. 3, 1999); see
also Amstar Corp. v. Envirotech Corp., 823 F.2d 1538, 1550 (Fed. Cir. 1987).
Therefore, Third Circuit precedent provides the applicable standard.

22-23).  Arlington contends that lost profits provides the appropriate measure for the imposition of a security bond, not lost sales, and suggests that a reasonable bond should be no greater than $10,000.  At the evidentiary hearing, Bridgeport stated that its lost profits are estimated at $71,000, which includes $7,000 in handling and warehouse costs.  (Hr'g Tr. at 120).  In <u>Arlington I</u> this court granted Arlington's request for a permanent injunction as well as Bridgeport's request for a stay of enforcement of the permanent injunction, and the court required Bridgeport to post a bond in the amount of twenty-five percent of Arlington's future lost profits damages.  (<u>Arlington I</u>, Doc. 776, at 16).  In the instant matter, Bridgeport claims that it will suffer $71,000 in lost profits as the result of the issuance of a preliminary injunction.  The court similarly finds that twenty five percent of this value, or $17,750, will adequately secure Bridgeport's rights should the preliminary injunction be vacated or the duplex connectors be deemed non-infringing in subsequent proceedings.  The preliminary injunction shall not take effect until Arlington posts a secured bond of $17,750.

**IV.**    <u>**Conclusion**</u>

For the foregoing reasons, the court will grant Arlington's motion (Doc. 369) for a preliminary injunction.  From the date that Arlington posts its secured bond, Bridgeport shall be enjoined from directly or indirectly making, using, selling, offering for sale, or importing, or causing or inducing others to make, use, sell, offer to sell, or import the Whipper-Snap duplex connectors, catalog numbers 3838ASP

and 3838SP, or any colorable imitations of these products, pending further decision

vacating the injunction or the expiration of the patent, whichever occurs first.[13]

An appropriate order follows.


　　　　　　　　　　　　　　　 S/ Christopher C. Conner
　　　　　　　　　　　　　　 CHRISTOPHER C. CONNER
　　　　　　　　　　　　　　 United States District Judge

Dated:　　　July 18, 2011

---

[13] In Bridgeport's brief in opposition to the motion for a preliminary
injunction Bridgeport requests a stay of these proceedings due to inconsistent claim
constructions between Arlington I and Arlington II, and pending procedural issues.
(Doc. 378, at 11-14).  A motion to stay requires the court to consider "(1) the length
of the requested stay; (2) the 'hardship or inequity' that the movant would face in
going forward with the litigation; (3) the injury that a stay would inflict upon the
non-movant; [and] (4) whether a stay will simplify issues and promote judicial
economy."  Blevins v. Katherman, Civil Action No. 1:07-CV-0633, 2009 WL 712350
(M.D. Pa. Mar. 16, 2009) (quoting Structural Group, Inc. v. Liberty Mut. Ins. Co.,
Civ. A. No. 1:07-CV-01793, 2008 WL 4616843, at *5 (M.D. Pa. Oct. 16, 2008)).
Bridgeport did not address these factors, nor will the court.  The request is denied.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ARLINGTON INDUSTRIES, INC.,** | : | **CIVIL ACTION NO. 3:06-CV-1105** |
| | : | |
| **Plaintiff,** | : | |
| | : | **(Judge Conner)** |
| **v.** | : | |
| | : | |
| **BRIDGEPORT FITTINGS, INC.,** | : | |
| | : | |
| **Defendant** | : | |

## <u>ORDER</u>

AND NOW, this 18th day of July, 2011, upon consideration of the motion for a preliminary injunction (Doc. 369), filed by Arlington Industries, Inc., and for the reasons set forth in the accompanying memorandum, it is hereby ORDERED that:

1. The motion for a preliminary injunction (Doc. 369), filed by Arlington Industries, Inc. is GRANTED.

2. Bridgeport Fittings, Inc., its officers, agents, attorneys, servants, employees, successors, assigns and all those in active concert or participation with them, who receive actual notice of this preliminary injunction by personal service or otherwise, are preliminarily ENJOINED from directly or indirectly making, using, selling, offering for sale or importing or causing or inducing others to make, use, sell, offer to sell, or import the Whipper-Snap Duplex products identified in this action as models 3838ASP and 3838SP, or any colorable imitation of such Whipper-Snap Duplex products during the term of United States Patent Number 5,266,050, which expires on December 4, 2011, or until said patent is declared invalid or unenforceable by a court of competent jurisdiction, from which no further appeal is possible, or the Whipper-Snap Duplex products are deemed non-infringing whichever occurs first.

3.      The preliminary injunction described in the preceding paragraph shall
        not issue until Arlington Industries, Inc. posts a bond in the amount of
        $ 17,750 with the Clerk of Court.  <u>See</u> Fed. R. Civ. P. 65©.


                                     <u>  S/ Christopher C. Conner   </u>
                                     CHRISTOPHER C. CONNER
                                     United States District Judge