## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ARLINGTON INDUSTRIES, INC.,** | : | **CIVIL ACTION NO. 3:06-CV-1105** |
| | : | |
| **Plaintiff** | : | **(Chief Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **BRIDGEPORT FITTINGS, INC.,** | : | |
| | : | |
| **Defendant** | : | |

## MEMORANDUM

Presently before the court is Arlington Industries, Inc.'s ("Arlington") motion (Doc. 465) for summary judgment of damages for sales of Bridgeport Fittings, Inc.'s ("Bridgeport") Whipper-Snap Duplex Connectors, catalog numbers 3838ASP and 3838SP, previously held to infringe Arlington's United States Patent Number 5,266,050 ("the '050 patent"). (See Doc. 458). For the reasons that follow, the court will grant the motion.

## I.    Factual Background & Procedural History

Arlington and Bridgeport are fierce competitors in the electrical conduit fitting industry. This case concerns a particular type of electrical conduit fitting with a snap-in feature. Litigation between the parties over patents underlying this type of fitting has been ongoing since 2001. See Arlington Indus., Inc. v. Bridgeport Fittings, Inc., Civ.A.No. 3:01-CV-0485 (M.D. Pa.) (hereinafter "Arlington I"). The Arlington I litigation, instituted in 2001, originally concerned only Bridgeport's Single Connector snap-in products. Bridgeport's Duplex Connector fittings entered the dispute in 2006, with the commencement of the above-captioned case

(hereinafter "Arlington II").  (Doc. 3).  The Duplex Connectors later became a part of Arlington I during the discovery phase of that litigation.  Unbeknownst to the Honorable A. Richard Caputo, who initially oversaw the above-captioned action,[1] and the undersigned, who presided over the Arlington I litigation, the parties litigated identical claims regarding the Duplex Connectors in the two cases. Through oversight or inadvertence, neither party found it necessary to seek immediate consolidation, and this matter and Arlington I proceeded on parallel tracks.  Suffice it to say that the procedural path leading to the motion *sub judice* has been rather tortured.

### A.    Arlington's '050 Patent

In 1992, Arlington developed and manufactured a new type of electrical conduit fitting, intended to replace previous units whose installation required the use of two hands to screw the device into an electrical junction box.[2]  (See Doc. 102, Ex. B).  This electrical conduit fitting, also called a connector, allows a user to quickly connect the device to a junction box using one hand instead of two, thereby reducing the time and effort required during installation.  (See id. at col. 1).

On December 15, 1992, Arlington acquired United States Patent Number 5,171,164 ("the '164 patent"), which covered the design of this device.  (Arlington I, Doc. 404 ¶ 2; Doc. 432 ¶ 2).  The following year, Arlington secured the '050 patent. (Doc. 102, Ex. B).  The '050 patent was a "continuation patent," meaning that it

---

[1] Judge Caputo transferred the case to the undersigned on June 24, 2011. (Doc. 368).

[2] An electrical junction box is used to run multiple conductors in two or more directions, allowing power to flow simultaneously to various electrical devices.

2

shared a common specification with the '164 patent, but included different claims. (<u>Arlington I</u>, Doc. 404 ¶ 2; Doc. 432 ¶ 2).

In 1999, Bridgeport introduced its own product line of quick-connect fittings called the "Snap-In Fitting." (<u>See</u> <u>Arlington I</u>, Doc. 170 at 7-10).  Certain characteristics of the Snap-In Fittings were nearly identical to those featured in Arlington's patented products.  (<u>See</u> <u>Arlington I</u>, Doc. 310 ¶ 2.5).  Arlington filed the <u>Arlington I</u> litigation in March 2001, alleging that the Snap-In Fittings infringed both the '164 and the '050 patents.  (<u>See</u> <u>Arlington I</u>, Doc. 1).

### B.   The Whipper-Snap Duplex Connectors

In September 2005, Bridgeport designed a new type of quick-connect electrical fitting similar to the '050 patent, which it called the "Whipper-Snap." (<u>See</u> <u>Arlington I</u>, Doc. 404 ¶ 14; Doc. 432 ¶ 14).  Bridgeport subsequently initiated an action requesting a declaratory judgment that its Whipper-Snap fittings did not infringe the '050 patent.  (<u>See</u> <u>Arlington I</u>, Doc. 584).  In an order dated April 6, 2006, the court consolidated Bridgeport's declaratory judgment action with <u>Arlington I</u>. (<u>Arlington I</u>, Doc. 267).

On February 18, 2003, Arlington acquired United States Patent Number 6,521,831 ("the '831 patent") for a type of two-wire, or duplex, electrical fitting. (Doc. 114 ¶ 2; Doc. 154 ¶ 2; Doc. 328 at 3).  Arlington filed the instant litigation on May 31, 2006, alleging that Bridgeport's Duplex Connectors—two products in the Whipper-Snap product line—infringed the '831 patent.  (Doc. 1).  In response, Bridgeport filed a petition with the United States Patent & Trademark Office ("PTO") seeking *inter partes* reexamination of the '831 patent.  (<u>See</u> Docs. 139, 142).

The PTO granted Bridgeport's request and shortly thereafter commenced its review.  (<u>See</u> Docs. 139, 142).

By amended complaint dated June 27, 2006, Arlington asserted a second claim against the Duplex Connectors, alleging that they infringed the '050 patent. (Doc. 3).  This claim also became a part of <u>Arlington I</u> during discovery.  From that point forward, the parties litigated the same issue—infringement of the '050 patent by the Duplex Connectors—in both <u>Arlington I</u> and <u>Arlington II</u>.

### C.      Protracted Litigation

On December 4, 2007, Judge Caputo issued his <u>Markman</u> claim construction ruling on the '050 patent.  (Doc. 98).  Nearly three months later, on February 25, 2008, the <u>Arlington I</u> court issued its <u>Markman</u> ruling in which it construed certain terms of the '050 patent in a manner materially different from the construction issued by Judge Caputo.  (<u>Arlington I</u>, Doc. 376).  The parties filed motions for summary judgment in each case.  (<u>Arlington I</u>, Docs. 382, 385; <u>Arlington II</u>, Docs. 110, 112, 113).  On September 18, 2008, Judge Caputo granted Bridgeport's motions for summary judgment in the above-captioned case, concluding that Arlington could not prove infringement of the '050 patent by Bridgeport's Duplex Connectors. (Doc. 307).  However, on February 4, 2009, the <u>Arlington I</u> court denied the parties' cross-motions for summary judgment on the issue of infringement and set trial for September 2009.  (<u>See</u> <u>Arlington I</u>, Docs. 471, 474).

Days before trial, Bridgeport filed a motion to stay the trial in <u>Arlington I</u> on claim and issue preclusion grounds as a result of Judge Caputo's judgment of

non-infringement of the Duplex Connectors in the above-captioned case.  (<u>Arlington</u> <u>I</u>, Doc. 561).  The undersigned denied the motion, but excised the Duplex Connectors from trial to circumvent the issue preclusion conundrum stemming from conflicting claim constructions.  (<u>Arlington I</u>, Doc. 584).  A jury returned a verdict in favor of Arlington, finding that thirty of Bridgeport's Single Connector products infringed the '050 patent.  (<u>Arlington I</u>, Doc. 632).  The jury awarded Arlington lost profits damages and determined that Arlington was entitled to a reasonable royalty rate of 12%.  (<u>Id.</u>)

After the trial, Bridgeport filed a motion for renewed judgment as a matter of law and for a new trial, alleging in part that res judicata barred the jury's verdict concerning the Single Connectors.  See <u>Arlington I</u>, 692 F. Supp. 2d 487, 498-503 (M.D. Pa. 2010).  The court found that Judge Caputo's claim construction in <u>Arlington II</u> could be entitled to issue preclusive effect, but the court declined to apply the doctrine because "relitigation ha[d] already occurred" and Bridgeport delayed in presenting the issue until "the eve of a complex trial with witnesses, advocates, and the court assembled at significant expense."  <u>Id.</u> at 502.  The court further found that claim preclusion did not apply because Bridgeport failed to establish that the Single Connectors adjudged infringing at trial were "essentially the same" device as the Duplex Connectors adjudged non-infringing in <u>Arlington II</u> pursuant to Judge Caputo's claim construction.  <u>Id.</u> at 503.

Bridgeport also filed a motion to alter or amend the judgment in <u>Arlington I</u>, requesting in part that the court enter final judgment with respect to the Duplex Connectors.  (<u>Arlington I</u>, Doc. 774).  The <u>Arlington I</u> court found that, based on

Judge Caputo's judgment of non-infringement of the Duplex Connectors in the above-captioned case, Bridgeport was entitled to judgment of non-infringement as a matter of law on the Duplex Connectors.  (Id.)

The parties appealed both cases to the United States Court of Appeals for the Federal Circuit.  On January 20, 2011, the Federal Circuit issued its opinion with respect to the above-captioned matter.  Arlington II, 632 F.3d 1246 (Fed. Cir. 2011). Therein, the Federal Circuit vacated the grant of summary judgment of non-infringement of the '050 and '831 patents by the Duplex Connectors due to an erroneous claim construction in Arlington II.  Id.  The mandate issued on April 21, 2011.  (Doc. 365).  Judge Caputo subsequently re-opened Arlington II on June 24, 2011 and re-assigned the case to the undersigned for all further proceedings.  (Doc. 368).  On July 18, 2011, the court granted Arlington's motion for a preliminary injunction, enjoining Bridgeport from directly or indirectly making, using, selling, offering to sell or importing, or causing or inducing others to make, use, sell, offer to sell or import the Duplex Connectors.  (Doc. 392).  That preliminary injunction dissolved on December 4, 2011, when the '050 patent expired.

Following the Federal Circuit's decision in the above-captioned matter, the parties stipulated to the dismissal of the Duplex Connectors from Arlington I. (Arlington I, Docs. 838, 839, 840).  The Federal Circuit affirmed the judgment in Arlington I on September 6, 2012.  (Arlington I, Doc. 841).  Arlington then sought supplemental damages for the Single Connector sales made by Bridgeport between March 1, 2010 and December 4, 2011.  (Arlington I, Doc. 845).  The Arlington I court

held that Arlington was entitled to lost profits damages for this period, bringing the litigation to its conclusion.  (Arlington I, Docs. 887, 891).

The proceedings in Arlington II continued.  The court granted Arlington's motion for summary judgment of infringement on April 4, 2014, relying on collateral estoppel to hold that the Duplex Connectors were essentially the same as the Single Connectors and thus infringed the '050 patent.  (Doc. 458).  On August 29, 2014, the Federal Circuit affirmed the PTO's adverse *inter partes* reexamination ruling, invalidating the '831 patent for purposes of the matter *sub judice*.[3]  Arlington Indus., Inc. v. Bridgeport Fittings, Inc., 581 F. App'x 859 (Fed. Cir. 2014).  Accordingly, the court granted Arlington's motion (Doc. 483) to dismiss the claims related to the '831 patent with prejudice.  (Doc. 537).

On September 5, 2014, Arlington filed the instant motion (Doc. 465) for summary judgment of damages (based upon the judgment of infringement under the '050 patent (Doc. 458)) arising from the sales of Bridgeport's Duplex Connectors from January 1, 2006 through December 4, 2011.  The motion is fully briefed and ripe for disposition.

## II.   **Legal Standard**

Through summary adjudication the court may dispose of those claims that do not present a "genuine dispute as to any material fact" and for which a jury trial would be an empty and unnecessary formality.  See FED. R. CIV. P. 56(a).  The

---

[3] The PTO rejected Claim 1 of the '831 patent, which formed the basis of Arlington's related infringement allegations against Bridgeport's Duplex Connectors.  (See Doc. 427 at 3).

burden of proof is upon the non-moving party to come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief. <u>Pappas v. City of Lebanon</u>, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); <u>see</u> <u>also</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).  This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the non-moving party on the claims. <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250-57 (1986); <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587-89 (1986).  Only if this threshold is met may the cause of action proceed.  <u>Pappas</u>, 331 F. Supp. 2d at 315.

## III.   <u>Discussion</u>

A successful claimant must be awarded damages "adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer."  35 U.S.C. § 284.  Damages may be calculated in two ways under this statute.  "If the record permits the determination of actual damages, namely, the profits the patentee lost from the infringement, that determination accurately measures the patentee's loss."  <u>Hanson v. Alpine Valley Ski Area, Inc.</u>, 718 F.2d 1075, 1078 (Fed. Cir. 1983); <u>see</u> <u>Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.</u>, 246 F.3d 1336, 1354 (Fed. Cir. 2001); <u>Minco, Inc. v. Combustion Eng'g, Inc.</u>, 95 F.3d 1109, 1119 (Fed. Cir. 1996).  "If actual damages cannot be ascertained, then a reasonable royalty must be determined." <u>Hanson</u>, 718 F.2d at 1078; <u>see</u> <u>Crystal Semiconductor</u>, 246 F.3d at 1354; <u>Minco</u>, 95 F.3d at 1119.  The award of damages may be split between lost profits for the portion of sales for which the patentee can prove actual damages and reasonable royalty for the remainder.  <u>See</u> <u>Crystal Semiconductor</u>, 246 F.3d at 1354; <u>Minco</u>,

95 F.3d at 1119; State Indus., Inc. v. Mor-Flo Indus., Inc., 883 F.2d 1573, 1577 (Fed. Cir. 1989).

In the instant case, Arlington asserts that summary judgment of damages is warranted because the relief awarded in Arlington I for sales of Bridgeport's Single Connectors has collateral estoppel effects on the matter *sub judice*. (See Doc. 468 at 1-3). Specifically, Arlington avers that (1) the award of lost profits; (2) the method used to calculate lost profits; and (3) the 12% reasonable royalty rate determined in Arlington I apply equally to the infringing sales of the Duplex Connectors. (See id. at 10-22). Arlington further posits that the court's preliminary injunction findings in this action support the application of collateral estoppel. (See id. at 18-19). Consequently, Arlington contends that Bridgeport is precluded from re-litigating the issue of damages. (See id. at 1). Based upon this premise, Arlington's damages expert, Mark Gallagher ("Gallagher"), uses Arlington's and Bridgeport's sales data to calculate Arlington's damages as $1,054,651.27 in lost profits and $21,831.60 in reasonable royalties.[4] (Doc. 470, Ex. I, sched. 1-4).

Bridgeport responds that summary judgment should be denied because neither the damage awards in Arlington I nor the preliminary injunction findings in the present action may be accorded preclusive effect. (See Doc. 475 at 6-11). In its opposition papers, Bridgeport alleges that unresolved issues of material fact remain, pertaining to (1) Arlington's entitlement to lost profits; and (2) the

---

[4] Arlington submits that because it did not realize a profit on its infringed products in 2006, it is entitled to reasonable royalties for Bridgeport's Duplex Connector sales during that period. (See Doc. 468 at 4 n.1).

reasonable royalty rate for the infringing sales.  (See id. at 14-22).  Bridgeport additionally endeavors to undermine Gallagher's damages report by arguing that Gallagher's opinions are not based on sound economic proof and that his statements are inconsistent and founded on disputed facts.  (See Doc. 536).  For these reasons, Bridgeport requests a jury trial to determine appropriate damages.

The court will address the parties' arguments first by considering the elements of collateral estoppel in the context of the instant litigation, and then by evaluating the doctrine's applicability to the contested issues, *to wit*: lost profits and reasonable royalty damages.

### A.    Collateral Estoppel

"A fundamental precept of common-law adjudication, embodied in the related doctrines of collateral estoppel and res judicata, is that a 'right, question or fact distinctly put in issue and directly determined by a court of competent jurisdiction . . . cannot be disputed in a subsequent suit between the same parties or their privies . . . .' " Montana v. United States, 440 U.S. 147, 153 (1979) (quoting Southern Pacific R. Co. v. United States, 168 U.S. 1, 48-49 (1897)).  Collateral estoppel, also referred to as issue preclusion,[5] specifically bars re-litigation of an issue that was conclusively determined in a prior adjudication and that was essential to the original judgment.  See Witkowski v. Welch, 173 F.3d 192, 198 (3d Cir. 1999).  By foreclosing subsequent disputes over issues on which a court has

---

[5] The terms "issue preclusion" and "collateral estoppel" are used interchangeably in modern jurisprudence.  See, e.g., Venuto v. Witco Corp., 117 F.3d 754, 758 n.5 (3d Cir. 1997).

ruled, collateral estoppel promotes fairness and certainty, while "conserving judicial resources . . . and fostering reliance on judicial action by minimizing the possibility of inconsistent verdicts." B & B Hardware, Inc. v. Hargis Indus., Inc., 135 S. Ct. 1293, 1302-03 (2015) (quoting Montana, 440 U.S. at 153-54).

A finding of issue preclusion is appropriate when (1) "the issue sought to be precluded is the same as that involved in the prior action; (2) th[e] issue was actually litigated; (3) it was determined by a final and valid judgment; and (4) the determination was essential to the prior judgment."[6] Peloro v. United States, 488 F.3d 163, 175 (3d Cir. 2007) (quoting Burlington N. R.R. v. Hyundai Merch. Marine Co., 63 F.3d 1227, 1231-32 (3d Cir. 1995)).  The party seeking to invoke collateral estoppel bears the burden of proving each of its elements.  See Dici v. Pennsylvania, 91 F.3d 542, 548 (3d Cir. 1996).

In the present suit, Arlington avers that the damages issues addressed by the jury and by the court in Arlington I were actually litigated; determined by final and valid judgment; and essential to the ultimate award of damages.  (See Doc. 468 at 12).  Indeed, following extensive expert testimony on the matter, the Arlington I jury awarded Arlington lost profits damages and deemed the reasonable royalty rate to be 12%.  (Arlington I, Doc. 632).  Additionally, relying on supplementary

---

[6] In patent litigation, issue preclusion is governed by the law of the regional circuit.  See Applied Med. Res. Corp. v. U.S. Surgical Corp., 435 F.3d 1356, 1359-60 (Fed. Cir. 2006); Bayer AG. v. Biovail Corp., 279 F.3d 1340, 1345 (Fed. Cir. 2002) ("Because the application of collateral estoppel is not a matter within the exclusive jurisdiction of this court, this court applies the law of the circuit in which the district court sits.").  Federal Circuit precedent otherwise controls "procedural and substantive issues pertaining to patent law."  Whitserve, LLC v. Computer Packages, Inc., 694 F.3d 10, 26 (Fed. Cir. 2012) (quoting Wordtech Sys., Inc. v. Integrated Networks Solutions, Inc., 609 F.3d 1308, 1318 (Fed. Cir. 2010)).

briefing, declarations, and evidence, the <u>Arlington I</u> court held that Arlington was

entitled to lost profits for a post-trial damages period ending December 4, 2011.

(<u>Arlington I</u>, Docs. 887, 891).  The court thus agrees with Arlington that the question

of issue preclusion before the court turns solely on the first element of the doctrine:

whether "the issue[s] sought to be precluded [are] the same as th[ose] involved in

the prior action."[7]  <u>Peloro</u>, 488 F.3d at 175; (<u>see</u> Doc. 468 at 12).  The court's task

when undertaking this analysis is (1) to consider whether "substantial overlap

[exists] between the evidence or argument to be advanced . . . and that advanced in

the first" proceeding; and (2) to assess "[h]ow closely . . . the claims involved in the

two proceedings" relate to one another.  <u>Peloro</u>, 488 F.3d at 176 n.12 (quoting

RESTATEMENT (SECOND) OF JUDGMENTS § 27 cmt. c (1982)).  Stated differently, the

court must examine whether "the same general legal rules govern both cases" and

---

[7] The court notes that although Bridgeport claims that "[n]one of the factors [of collateral estoppel] are satisfied," its argument focuses on the second requirement of the doctrine: the issue in dispute must have been "actually litigated" in the first proceeding.  <u>Peloro</u>, 488 F.3d at 175; (<u>see</u> Doc. 475 at 6-7).  However, Bridgeport misapprehends the relevant inquiry.  It avers that "[b]ecause evidence regarding the models and factors affecting the quantity of duplex damages awarded was not 'actually litigated,' collateral estoppel cannot apply." (<u>Id.</u> at 7).  Whether a matter sought to be precluded was actually litigated "depends on the second court's concluding that the issue in dispute was *clearly resolved* by the first tribunal." <u>United Access Techs., LLC v. Centurytel Broadband Servs. LLC</u>, 778 F.3d 1327, 1331 (Fed. Cir. 2015) (emphasis added) (applying Third Circuit law).  In the matter *sub judice*, it is undisputed that Arlington's damage recovery was rigorously litigated and conclusively determined in <u>Arlington I</u>.  See <u>Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc.</u>, 458 F.3d 244, 253 (3d Cir. 2006) (noting that issues sought to be precluded must have been "fully litigated and given careful consideration" in the prior proceeding).  Viewed thusly, Bridgeport's contentions instead bear upon the first element of collateral estoppel: namely, whether the issues before the court are identical to those previously determined in <u>Arlington I</u>. The court will consider Bridgeport's averments in this light.

whether "the facts of both cases are indistinguishable as measured by those rules." Suppan v. Dadonna, 203 F.3d 228, 233 (3d Cir. 2000) (quoting WRIGHT AND MILLER, FEDERAL PRACTICE AND PROCEDURE § 4425 at 253 (1981)). For the reasons that follow, the court finds that the issues previously litigated and determined in Arlington I are identical to the matters contested herein and are thus entitled to preclusive effect.

**B.   Lost Profits**

To recover damages in the form of lost profits, a patentee must establish a reasonable probability that "but for" the infringement, it would have captured the infringer's sales. Ericsson, Inc. v. Harris Corp., 352 F.3d 1369, 1377 (Fed. Cir. 2003); Fuji Photo Film Co. v. Jazz Photo Corp., 249 F. Supp. 2d 434, 454 (D.N.J. 2003) ("In order to recover lost profits, a patent owner must demonstrate 'a causal connection between the infringement and its loss of profits.' " (quoting Bic Leisure Prods., Inc. v. Windsurfing Int'l, Inc., 1 F.3d 1214, 1218 (Fed. Cir. 1993))). Such a showing requires the patentee to "reconstruct the market to determine what profits the patentee would have made had the market developed absent the infringing product." Ericsson, 352 F.3d at 1377. A patentee's market reconstruction must be founded upon "sound economic proof of the nature of the market and likely outcomes with infringement factored out of the economic picture." Grain Processing Corp. v. Am. Maize-Prods. Co., 185 F.3d 1341, 1350 (Fed. Cir. 1999). When the patentee has established an inference of "but for" causation, the burden shifts to the infringer to show that this inference is unreasonable for some or all of

the lost sales.  See Rite-Hite Corp. v. Kelley Co., Inc., 56 F.3d 1538, 1545 (Fed. Cir.

1995).

Patent owners may resort to any market reconstruction theory that

establishes "but for" causation using reliable economic evidence.[8]  See Ericsson, 352

F.3d at 1377.  In Arlington I, Arlington proffered evidence under both a two-

supplier market theory and the familiar Panduit test.  The two-supplier theory

holds that "[w]hen the patent owner and infringers were the only suppliers of the

patented product, it is reasonable to infer that the patent owner would have made

the sales made by the infringers."  Del Mar Avionics v. Quinton Instr. Co., 836 F.2d

1320, 1327 (Fed. Cir. 1987).  To succeed under the two-supplier theory, a patentee

must show "(1) the relevant market contains only two suppliers, (2) its own

manufacturing and marketing capability to make the sales that were diverted to the

infringer, and (3) the amount of profit it would have made from these diverted

sales."  Micro Chem., Inc. v. Lextron, Inc., 318 F.3d 1119, 1124 (Fed. Cir. 2003).  The

Panduit test requires that a patentee prove: (1) a demand for the product during the

period in question; (2) an absence of acceptable non-infringing substitutes; (3) its

own manufacturing or marketing capability to exploit the demand; and (4) a

---

[8] Bridgeport contends that "the Federal Circuit's law on damages has changed since Arlington I. . . . [thus] Arlington now bears a stricter burden of economic analysis to establish its entitlement to damages."  (Doc. 475 at 10). Arlington responds that Bridgeport does not explicate any significant change of law such that collateral estoppel cannot be applied.  (Doc. 501 at 3-4).  The court is not persuaded by Bridgeport's contention.  Bridgeport has failed to demonstrate any "major changes in the [governing] law" which would preclude the doctrine's applicability.  See Montana, 440 U.S. at 161 (requiring a "change in controlling legal principles" to justify the preclusion of collateral estoppel); Burlington N. R.R., 63 F.3d at 1238.

computation of the profits it would have accrued.  <u>Panduit Corp. v. Stahlin Bros. Fibre Works</u>, 575 F.2d 1152, 1156 (6th Cir. 1978); <u>see</u> <u>also</u> <u>Cohesive Techs. v. Waters Corp.</u>, 543 F.3d 1351, 1373 (Fed. Cir. 2008) (quoting <u>Standard Havens Prods., Inc. v. Gencor Indus., Inc.</u>, 953 F.2d 1360, 1373 (Fed. Cir. 1991)).

Arlington asserts that it has already established its entitlement to lost profits for Bridgeport's sales of the Duplex Connectors, noting that "[b]ut for . . . the Duplex Connectors' removal from <u>Arlington I</u> on the eve of trial, . . . [the claim *sub judice*] would have been determined" therein.  (Doc. 468 at 10).  Arlington posits that the only difference between the Single and Duplex Connectors is that the Duplex Connectors "accept two cables instead of one," (Doc. 501 at 3), a dissimilarity which the court deemed inapposite when it applied collateral estoppel to adjudicate the Duplex Connectors infringing.  (Doc. 458).  Arlington further argues that the two products are otherwise indistinguishable as "they have the same selling features . . . [and] functionality . . . and are sold and marketed as part of the same Whipper-Snap product line to the same customers."  (<u>Id.</u>)

According to Arlington, "Bridgeport does not dispute that Arlington ha[d] the marketing and manufacturing capacity to make Bridgeport's sales, nor does it

dispute that Arlington's profits per unit are capable of being computed."[9]  (Doc. 468 at 11).  Arlington avers that two additional issues which were fully litigated and resolved in Arlington I are central to the instant lost profits analysis: (1) whether demand for the patented products existed; and (2) whether the parties operated in a two-supplier market, with no acceptable non-infringing substitutes.  (See id. at 13-19); see also Micro Chem., 318 F.3d at 1124; Panduit, 575 F.2d at 1156.  Arlington undergirds its position by highlighting the substantial overlap between the arguments and evidence advanced by the parties in Arlington I and in Arlington II. (Doc. 501 at 2).

Bridgeport alleges that disputed issues of material fact remain regarding Arlington's professed ability to capture 100% of the market for the infringing

---

[9] Bridgeport ostensibly rejects this characterization, responding broadly that "no evidence regarding duplex connectors was presented to the jury during the [Arlington I] trial," (Doc. 536 at 12), and that "Arlington . . . cannot establish that the damages evidence and issues in Arlington I are 'identical' to those at issue in this action."  (Doc. 475 at 1).  However, in its opposition materials, Bridgeport does not specifically address Arlington's marketing and manufacturing capacities or the computability of Arlington's profits.  Moreover, Bridgeport points the court to no record evidence regarding these issues.  See Podobnik v. U.S. Postal Serv., 409 F.3d 584, 594 (3d Cir. 2005) ("To survive summary judgment, a party must present more than just 'bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue." (quoting Celotex, 477 U.S. at 325 (1986))).  At the Rule 56 stage, the court must draw all reasonable inferences from the evidence in the light most favorable to the nonmoving party.  See Chambers ex rel. Chambers v. Sch. Dist. of Phila. Bd. of Educ., 587 F.3d 176, 181 (3d Cir. 2009).  As Bridgeport offers the court no evidence to so construe, the court deems the aforementioned elements of the lost profits analysis to be satisfied by Arlington.

Duplex Connectors.[10]  (See Doc. 475 at 14-21).  With respect to demand, Bridgeport avers that Arlington marketed its duplex products based on non-patented features and that Arlington's damages analysis fails to consider the impact of these non-patented features on demand.  (Id. at 17).  Bridgeport additionally argues that that the parties' snap-in duplex connectors competed with alternative products and that acceptable, non-infringing substitutes existed during the period of infringement.  (Id. at 16, 21).

### 1.   *Prior Evidence*

Prior to the Duplex Connectors' excision from the trial in Arlington I, both parties submitted expert reports which made no distinction between the Single and Duplex Connectors with respect to lost profits and reasonable royalties.  (Doc. 470, Ex. A at 3-14; id., Ex. B at 3-12; see Doc. 468 at 4).  After the court excised the Duplex Connectors from the proceedings, the parties' experts altered their reports to include only the Single Connectors; notably, the updated submissions did not modify the methods used to calculate damages.  (Doc. 470, Ex. C at 1-3 ("I have not

---

[10] Bridgeport further submits that "offensive collateral estoppel is disfavored," (Doc. 475 at 9), citing Parklane Hosiery Co. v. Shore in support of this proposition.  439 U.S. 322 (1979).  Offensive collateral estoppel arises when a plaintiff seeks to preclude a defendant from re-litigating a matter which the defendant lost in a prior action, typically against a different party.  See Raytech Corp. v. White, 54 F.3d 187, 190 (3d Cir. 1995).  In Parklane Hosiery, the United States Supreme Court held that trial courts exercise broad discretion in determining when to apply offensive collateral estoppel.  Id. at 331.  The Court simply cautioned that the doctrine should be avoided under certain unique factual circumstances causing unfairness to the defendant, *to wit*, suits in which a plaintiff had ample opportunity to join in the earlier action.  Id.  This is plainly distinct from the instant case, as Bridgeport will suffer no extraordinary prejudice as a result of the court's ruling.  In fact, as discussed in greater detail *infra*, Bridgeport had a "full and fair" opportunity to litigate issues related to damages in the first action. Parklane Hosiery, 439 U.S. at 332.  Hence, the court rejects Bridgeport's argument.

altered the approach to calculating lost profits or reasonable royalties."); id., Ex. D

at 2 ("My opinions, as expressed in my previous reports, have not changed, and my

previous reports are incorporated by reference."); see Doc. 468 at 4).

At trial, Arlington established that it was entitled to lost profits damages for

sales of the Single Connectors. Arlington's Vice President Thomas Gretz ("Gretz")

and Gallagher provided testimony, which the jury found credible, that the market at

issue was comprised of only two suppliers. (Arlington I, Doc. 655 at 216, 219-21;

Doc. 658 at 53-58). Specifically, Gallagher explained the manner in which

Bridgeport mimicked Arlington's pricing strategies and coached its salespeople to

compare Bridgeport and Arlington products. (Arlington I, Doc. 658 at 53-58). Gretz

testified to the similarity in both parties' customer base, and stated that no other

company sold quick-connect fittings similar to Arlington and Bridgeport products.

(Arlington I, Doc. 655 at 216, 219-21). Gretz and Gallagher also testified to the lack

of acceptable non-infringing substitutes in the quick-connect fitting market. (Id. at

234-36; Doc. 656 at 71-72). Finally, Gallagher testified to the demand for Arlington's

patented products based upon the high volume of sales enjoyed by both parties.

(Arlington I, Doc. 658 at 39-42).

Ludington appeared on Bridgeport's behalf and testified that Arlington was

not entitled to lost profits damages because alternative products may be acceptable

to the parties' customers. (Arlington I, Doc. 662 at 112-13). Ludington further

represented that Gallagher's calculations failed to consider the complexities of the

snap-in connector market, citing product distribution variance between suppliers,

market expansion, available alternatives, and price elasticity. (Id. at 112-23). With

respect to demand, Ludington advised that Gallagher did not contemplate whether demand for Arlington's single connector products may be attributable to non-patented features.  (Id. at 112-13; 124-26).  She did, however, agree that there was demand for the patented features of Arlington's products.  (Id. at 192-99).  Ultimately, relying on the testimony presented by Gretz and Gallagher, the jury awarded Arlington lost profits damages.  (Arlington I, Doc. 632).

The Arlington I court subsequently denied Bridgeport's motion for judgment as a matter of law, concluding that there was sufficient evidence to support the jury award.  (Arlington I, Doc. 773 at 44-49).  Thereafter, the parties stipulated to lost profits damages for the period of July 1, 2009 to February 28, 2010.  (See Arlington I, Docs. 783, 786, 789, 799).  The Federal Circuit affirmed the court's final judgment, including the lost profits award.  (Arlington I, Doc. 841).

The Arlington I court later awarded Arlington lost profits for a supplementary damages period spanning March 1, 2010 to December 4, 2011.  (Arlington I, Docs. 887, 891).  The court relied on updated briefing, declarations, and evidence, noting that "Gallagher calculate[d] the additional award for the contested period by applying updated financial information to the same method of calculation that the jury used to award damages."  (Arlington I, Doc. 887 at 3).  The court also credited Gretz's representation that no new suppliers had entered the market during the supplementary period.  (Id.)

Finally, on July 1, 2011, Arlington filed a motion for a preliminary injunction in the above-captioned matter, seeking to enjoin Bridgeport from directly or indirectly making, using, selling, offering to sell or importing, or causing or

inducing others to make, use, sell, offer to sell or import the Duplex Connectors. (Doc. 369).  The court conducted an evidentiary hearing on the motion, and the parties thoroughly briefed the matter and submitted declarations and exhibits in support of their respective positions.  (See Docs. 370-88).  Bridgeport's Chief Executive Officer, Paul Suzio, opposed the motion by submitting marketing materials for numerous connector products manufactured and sold by other companies, purporting to demonstrate that Arlington and Bridgeport were not the only competitors in the market for duplex snap-in products.  (Doc. 382 ¶¶ 4-9).  The court granted the preliminary injunction on July 18, 2011.  (Doc. 392).

Based upon the record evidence and the testimony set forth at the hearing, in its findings of fact, the court held that Arlington and Bridgeport were the only two competitors in the market for electrical conduit fittings with the snap-in feature at issue in the litigation.  (Id. at 8).  Specifically, the court found that "[o]ther similar products on the market identified by Bridgeport d[id] not practice the features practiced by the Arlington and Bridgeport duplex connectors."  (Id.)  The court also found that "[s]ince 1999, when the duplex connectors were introduced into the

market, Arlington has sold approximately 40 million units, comprising [8%] of Arlington's total sales." (Id.)[11]

## 2. Comparing the Issues

Having reviewed the body of evidence advanced in Arlington I and the earlier stages of Arlington II pertaining to the two disputed elements in the lost profits claim before the court, the court will now consider said evidence in the context of the parties' arguments on the present motion. Using the same theories adopted by the jury and by the Arlington I court, Arlington submits an updated expert report, prepared by Gallagher, in support of its motion. (Doc. 470, Ex. I).

---

[11] Arlington asserts that the court's preliminary injunction findings conclusively determined that the duplex product market contained only Arlington and Bridgeport as suppliers. (Doc. 468 at 20). Trial courts in the Third Circuit may grant preclusive effect to findings set forth in preliminary injunction opinions "if the circumstances make it likely that the findings are accurate and reliable." McTernan v. City of York, 577 F.3d 521, 531 (3d Cir. 2009). Such determinations must be "sufficiently firm" so as to obviate the need for further litigation. Hawksbill Sea Turtle v. Fed. Emergency Mgmt. Agency, 126 F.3d 461, 474 n.11 (3d Cir. 1997). "In determining whether [a] resolution was sufficiently firm, the . . . court should consider whether the parties were fully heard, whether a reasoned opinion was filed, and whether that decision could have been, or actually was, appealed." In re Brown, 951 F.2d 564, 569 (3d Cir. 1991); cf. Pa. Pub. Interest Research Grp., Inc. v. P.H. Glatfelter Co., 128 F. Supp. 2d 747, 757 (M.D. Pa. 2001) (declining to grant preclusive effect where the presiding judge offered "no explanation in the order regarding what evidence or testimony from the hearing supported [his] findings, nor what legal principles he relied upon" and no transcript was available).

Arlington avers that the court's findings are sufficiently firm because "the Court filed a reasoned opinion, that could have been appealed, after receiving full briefing (including supporting declarations) from the parties and holding an evidentiary hearing." (Doc. 501 at 24). The court agrees. The resolutions sought to be precluded in the instant motion—chief among them, the determination that Arlington and Bridgeport occupied a two-supplier market with respect to duplex snap-in connectors—were reached through accurate and reliable procedures and carefully considered. See McTernan, 577 F.3d at 531. Additional litigation on the matter would prolong this grossly overextended action and waste judicial resources. Therefore, the court will grant preclusive effect to the relevant findings of facts laid out in its preliminary injunction opinion. (See Doc. 392).

Likewise, Bridgeport presents an updated damages report prepared by Ludington. (Doc. 481-9).

With respect to the first contested <u>Panduit</u> factor—demand for the product during the period in question—neither Gallagher nor Ludington initially distinguished between the Single and Duplex Connectors in their analysis. <u>See</u> <u>Cohesive Techs.</u>, 543 F.3d at 1373; <u>Panduit</u>, 575 F.2d at 1156; (Doc. 470, Ex. A at 3-14; <u>id.</u>, Ex. B at 3-12; Doc. 468 at 4). Gallagher later testified in <u>Arlington I</u> that there was demand for Arlington's patented products, based upon the high volume of sales enjoyed by both parties. (<u>Arlington I</u>, Doc. 658 at 39-42). In his present damages report, Gallagher similarly opines that Arlington has enjoyed consistently strong sales of its snap-in product line, including the duplex models. (Doc. 470, Ex. I at 11).

Ludington opined at trial that Arlington's demand appraisal failed to consider the extent to which demand for Arlington's single connector products may have been attributable to non-patented features. (<u>Arlington I</u>, Doc. 662 at 112-13; 124-26). She further testified, however, that there was demand for the patented features of Arlington's products. (<u>Id.</u> at 192-99). In her current damages report, Ludington raises the same apportionment argument, noting with disapproval that "Arlington's damage claim is implicitly based on the assumptions that all demand for the accused products is attributable to the features of the '050 patent." (Doc. 481-9 at 8). Lastly, further informing the issue of demand, the <u>Arlington II</u> court found in its preliminary injunction opinion that Arlington had sold over 40 million duplex snap-in products, constituting 8% of its gross sales since 1999. (Doc. 392 at 8).

The second <u>Panduit</u> factor necessitates a showing that the market lacked acceptable non-infringing substitutes during the relevant time period.  <u>See</u> <u>Cohesive Techs.</u>, 543 F.3d at 1373; <u>Panduit</u>, 575 F.2d at 1156.  Similarly, the two-supplier theory requires a patentee to demonstrate that the two competing companies were the sole suppliers in the market.  <u>See</u> <u>Micro Chem.</u>, 318 F.3d at 1124.  As previously noted, Gallagher and Ludington initially presented a single opinion for both the Single and Duplex Connectors on this issue.  (<u>See</u> Doc. 470, Ex. A at 3-14; Ex. B at 3-12; Doc. 468 at 4).  At trial, limiting their testimony to the Single Connectors, Gallagher and Gertz testified that Arlington and Bridgeport occupied the relevant market, citing Bridgeport's pricing strategies, Bridgeport's comparative sales tactics, and the parties' overlapping customer bases in support of their opinions.  (<u>Arlington I</u>, Doc. 655 at 216, 219-21; Doc. 658 at 53-58).  The <u>Arlington I</u> court relied on similar testimony in granting Arlington lost profits damages for the supplementary period following trial.  (<u>Arlington I</u>, Doc. 887 at 3).

In his present report, Gallagher asserts once more that he is unaware of any acceptable non-infringing substitutes in the market during the relevant time period, now considering only the duplex connector products.  (Doc. 470, Ex. I at 14-21).  He evaluates the alternative connectors represented as such by Bridgeport during discovery, determining in each instance that the submitted product does not qualify as a non-infringing substitute.  (<u>Id.</u>)  For example, Gallagher notes that the connectors which Bridgeport introduces for the first time as acceptable substitutes are merely the duplex versions of previously rejected single connectors.  (<u>Id.</u> at

15-18).  In Gallagher's opinion, each of these duplex products is functionally identical to its single connector counterpart and therefore does not constitute an acceptable non-infringing substitute.  (Id.)

At trial, Ludington responded to Arlington's expert testimony by asserting that Arlington had failed to perform a proper market analysis, and that, as a result, its proffered testimony as to the single connector products was unreliable. (Arlington I, Doc. 662 at 149-153).  Ludington also presented her research regarding potential acceptable alternatives in the marketplace, noting that the complex snap-in connector market includes a wide range of manufacturers, distributors, and end users.  (Id. at 140-54).  Ludington advances similar arguments in her present report, asserting that, during the relevant time period, the duplex products varied widely by type and intended use.  (Doc. 481-9 at 6-25).  She posits that Arlington's analysis fails to account for factors such as price difference, market fluctuation, and customer loyalty.  (Id.)  Significantly, in its opinion granting Arlington's request for a preliminary injunction against the Duplex Connectors, this court held that Arlington and Bridgeport were the only two competitors in the snap-in market and that the market lacked acceptable non-infringing substitutes.  (Doc. 392 at 8).

Considering the foregoing, the court finds that the parties have advanced virtually indistinguishable evidence and arguments in Arlington I and Arlington II regarding (1) the demand for Arlington's patented products; and (2) the presence of acceptable non-infringing substitutes in the market.  The court additionally relies upon its prior findings of fact in the instant case concerning (1) Arlington's substantial duplex product sales as evidence of demand; and (2) the existence of a

two-supplier market with no acceptable non-infringing substitutes.  In sum,

Arlington has proven for purposes of collateral estoppel that the issues it seeks to

preclude are the same as those previously determined in <u>Arlington I</u>.  <u>See</u> <u>Dici</u>, 91

F.3d at 548.

### 3.    *Disputes of Material Fact*

Bridgeport's remaining arguments contra lost profits damages may be

distilled into two main assertions: 1) that the court may not assume that Arlington

would have made 100% of Bridgeport's accused sales because changing market

conditions, the price sensitivity of the parties' customers, and Bridgeport's

revamped marketing strategies affected brand loyalty and price elasticity during

the contested period; and (2) that the court should consider Arlington's sales from

the period when the injunction was in effect—July 18, 2011 to December 4, 2011.

(<u>See</u> Doc. 475 at 18-20).

 Arlington responds that Bridgeport's opposition papers "consist entirely of

arguments and purported factual disputes that have been previously raised and

rejected by a jury, this Court . . . and the Federal Circuit."  (Doc. 501 at 1).  The

court agrees with Arlington; any disputes of material fact concerning Arlington's

entitlement to lost profits resulting from sales of the Duplex Connectors are

foreclosed by the jury's verdict and the court's holding in <u>Arlington I</u>.  When a party

seeks collateral estoppel based on a jury verdict, the court must determine

"whether a rational jury could have grounded its verdict upon an issue other than"

the issue sought to be precluded.  <u>Schiro v. Farley</u>, 510 U.S. 222, 233 (1994).  From a

general verdict, the court may "presume[] the existence of fact findings implied

from the jury's having reached that verdict." Starceski v. Westinghouse Elec. Corp., 54 F.3d 1089, 1100 (3d Cir. 1995) (quoting R.R. Dynamics, Inc. v. A. Stucki Co., 727 F.2d 1506, 1516 (Fed. Cir. 1984) ("The general verdict thus includes the jury's legal conclusion and a set of implied fact findings, the latter being those necessary to support the legal conclusion encompassed in the verdict.").

In reaching the verdict that Arlington was entitled to lost profit damages, the jury determined that the single connector fittings satisfied the two-supplier theory and the Panduit test.  See Cohesive Techs., 543 F.3d at 1373; Micro Chem., 318 F.3d at 1124; Panduit, 575 F.2d at 1156.  Therein, the jury necessarily concluded that there was a demand for the patented products and that the snap-in fitting market lacked non-infringing substitutes.  See Cohesive Techs., 543 F.3d at 1373; Micro Chem., 318 F.3d at 1124.  The court is thus satisfied that the jury in Arlington I based its verdict upon the same issues Arlington now seeks to preclude.  See Schiro, 510 U.S. at 233.

In sum, the parties' expositions concerning the two-supplier market theory and the Panduit factors are essentially indistinguishable as between the respective actions.  See Peloro, 488 F.3d at 176 n.12; Suppan, 203 F.3d at 233.  Moreover, the claim before the court is identical in all relevant respects to the lost profits claims adjudicated in Arlington I, to wit: both the Single and the Duplex Connectors infringed the '050 patent during the same time period,[12] and they did so by meeting

---

[12] Arlington I concluded June 23, 2011, (see Arlington I, Doc. 887), and Arlington II concluded July 18, 2011, approximately three weeks later.  (See Doc. 392).

each limitation identified in Claim 8 of the '050 patent.  <u>See</u> <u>Peloro</u>, 488 F.3d at 176

n.12; <u>Suppan</u>, 203 F.3d at 233.  Accordingly, Bridgeport is estopped from

re-litigating its arguments concerning the award of lost profits damages.  The court

finds that Arlington is entitled to $1,054,651.27 in lost profits damages.

### C.    Reasonable Royalty

When actual damages cannot be proven, a reasonable royalty must be

determined.  <u>See</u> <u>Applied Med. Res. Corp. v. U.S. Surgical Corp.</u>, 435 F.3d 1356,

1361 (Fed. Cir. 2006).  Such a determination is undertaken with the goal of

identifying the "amount necessary to adequately compensate [the patentee] for

infringement."  <u>Maxwell v. J. Baker, Inc.</u>, 86 F.3d 1098, 1109 (Fed. Cir. 1996).  The

proper calculation is based on "hypothetical negotiations between willing licensor

and willing licensee," occurring when the infringement commenced.  <u>Applied Med.</u>,

435 F.3d at 1356 (citing <u>Fromson v. W. Litho Plate & Supply Co.</u>, 853 F.2d 1568, 1574

(Fed. Cir. 1988)).  The fact finder tasked with this analysis may consider a variety of

additional factors, such as "royalties received by the patentee for the licensing of

the patent in suit, opinion testimony of qualified experts, [and] the patentee's

relationship with the infringer."  <u>Maxwell</u>, 86 F.3d at 1109; <u>see</u> <u>Georgia-Pacific Corp.</u>

<u>v. U.S. Plywood Corp.</u>, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970) (listing fifteen

factors).

Arlington contends that Bridgeport is precluded from re-litigating the

reasonable royalty rate for the Duplex Connectors, asserting that the issues

underlying the reasonable royalty rate are identical for the Single and Duplex

Connectors.  (<u>See</u> Doc. 468 at 20).  In support of its averment, Arlington

incorporates all arguments raised *supra* that are equally applicable to both lost profits and reasonable royalty damages.  (See Doc. 468 at 2-21; Doc. 501 at 21-22).  Arlington emphasizes that the expert reports initially submitted in Arlington I did not distinguish between the Single and Duplex Connectors with respect to reasonable royalties.  (Doc. 470, Ex. A at 3-14; id., Ex. B at 3-12; see Doc. 468 at 20).  In essence, Arlington avers that the evidence regarding reasonable royalty damages presented to the jury in Arlington I is identical to the evidence now before the court.

In reply, Bridgeport asserts that issues of material fact exist regarding the appropriate reasonable royalty damages.  (See Doc. 475 at 21).  Specifically, Bridgeport argues that the court must deny summary judgment "[b]ecause the parties and their experts disagree regarding the facts, methodology and analysis for calculating damages."  (Id. at 22).  Bridgeport further claims that the experts have merely presented competing royalty ranges and that final determination of the proper percentage rate lies exclusively within the province of the jury.  (Id. at 21-22).  Otherwise, Bridgeport raises no new arguments pertaining to the issue of reasonable royalty damages and instead relies entirely on its general averments in opposition to the motion.  (See generally Docs. 475, 536).  For the same reasons explained in detail *supra*, Bridgeport's claims are foreclosed by the jury's royalty rate determination in Arlington I.  (See Arlington I, Doc. 632).

The Federal Circuit's decision in Applied Medical Resources Corp. v. U.S. Surgical Corp. is instructive.  435 F.3d 1356.  In two separate actions, similar products sold by defendant U.S. Surgical Corporation were adjudged infringing of the same patent over two distinct periods of time.  (Id. at 1358-59).  In the second

case, the Federal Circuit affirmed the district court's decision not to apply collateral estoppel to the issue of reasonable royalty damages.  (Id. at 1359).  The products at issue were "vastly different" such that the two actions adjudicated materially different infringement issues stemming from the dissimilarities between the two products.  (Id. at 1361-62).  In so holding, the court noted, "We recognize that there may be instances . . . in which two products, even if not identical, may present the same damages analysis."  (Id. at 1363).

Arlington succeeds as to reasonable royalty damages for the same reasons it prevails with respect to lost profits; first, there is substantial overlap between the arguments and evidence put forth by the parties regarding the instant motion and those previously advanced in Arlington I.  See Peloro, 488 F.3d at 176 n.12; Suppan, 203 F.3d at 233.  Gallagher and Ludington have consistently assessed reasonable royalties utilizing the well-established Georgia-Pacific factors, prompting the jury to consider the same in reaching its decision to award a royalty rate of 12%.  318 F. Supp. 1116; (see Doc. 470, Ex. A at 14-20 (Gallagher's June 1, 2007 pre-trial report); Doc. 481-8 at 13-22 (Ludington's October 18, 2007 pre-trial report)).  Gallagher's and Ludington's submissions on the present Rule 56 record follow the same course.  (See Doc. 470, Ex. I at 22-33; Doc. 481-9 at 26-34).  Second, the claim before the court is identical in all relevant respects to that which was decided by the jury in Arlington I.  See Peloro, 488 F.3d at 176 n.12; Suppan, 203 F.3d at 233.  Unlike the products in Applied Medical, the Single and Duplex Connectors are functionally identical; they infringed the same patent in exactly the same manner.  435 F.3d at 1361-62.  Consequently, Bridgeport is estopped from re-litigating its

arguments concerning the reasonable royalty rate to be applied in the matter before the court.  The court therefore finds that Arlington is entitled to $21,831.60 in reasonable royalty damages.

## IV.   <u>Conclusion</u>

Given the prerequisites and policies which underlie the doctrine of collateral estoppel, its application in the instant action is exceedingly appropriate. Conducting a trial to determine Arlington's damages arising from the sales of Duplex Connectors would involve arguments and witnesses identical to those presented in <u>Arlington I</u>.  Indeed, the facts relevant to the award and calculation of lost profits damages, and to the determination of a reasonable royalty rate, are indistinguishable from those previously introduced regarding Bridgeport's Single Connectors.  Further, the claims *sub judice* are virtually identical to those previously adjudicated in <u>Arlington I</u>.

For all of the foregoing reasons, the court will grant Arlington's motion (Doc. 465) for summary judgment of damages for sales of Bridgeport's Duplex Connectors, catalog numbers 3838ASP and 3838SP.  An appropriate order follows.


<u>/S/ CHRISTOPHER C. CONNER</u>
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania


Dated:      May 7, 2015